1          **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE SOUTHERN DISTRICT OF TEXAS**
2               **HOUSTON DIVISION**

3  ANDREW WILLEY              )       NO. 4:20-CV-1736
                      )
4                       )
 VS.                  )       Houston, Texas
5                       )       3:53 p.m.
                      )
6  HARRIS COUNTY DISTRICT     )       AUGUST 3, 2020
 ATTORNEY              )
7

8

9   **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

10                   **HEARING**

11       **BEFORE THE HONORABLE LYNN N. HUGHES**

12         **UNITED STATES DISTRICT JUDGE**

13            **VOLUME 1 OF 1**

14
  **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
15 APPEARANCES:

16 FOR THE PLAINTIFF:

17     Mr. Charles Lewis Gerstein
    Civil Rights Corps
18     1601 Connecticut Avenue NW
    Suite 800
19     Washington, DC  20009
    Tel:  202-894-6142
20     Email:  Charlie@civilrights.org
    (TELEPHONIC APPEARANCE)
21
    Mr. Nathan Alexander Fennell
22     Texas Fair Defense Project
    314 E. Highland Mall Blvd.
23     Suite 204
    Austin, Texas  78752
24     Tel:  512-637-5220
    Email:  Nfennell@fairdefense.org
25     (TELEPHONIC APPEARANCE)

```
 1  APPEARANCES:   (CONTINUED)

 2  FOR THE DEFENDANT:

 3       Mr. Scott Anthony Durfee
         Ms. Elizabeth Stevens
 4       Harris County District Attorney's Office
         1201 Franklin
 5       6th Floor
         Houston, Texas  77002
 6       Tel:  713-368-9275
         Email: Durfee_scott@dao.hctx.net
 7
    COURT REPORTER:
 8
         Ms. Kathleen K. Miller, CSR, RMR, CRR
 9       515 Rusk, Room 8004
         Houston, Texas  77002
10       Tel:  713-250-5087

11  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-assisted transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2                     AUGUST 3, 2020
 3                 *  *  *  *  *  *  *  *  *  *  *
 4             THE COURT:  Thank you.  Be seated.
 5                   All right.  Mr. Gerstein.
 6             MR. GERSTEIN:  Yes, this is Mr. Gerstein.
 7             THE COURT:  Okay.  I have Mr. Fennell on a
 8   different phone, and a couple of live bodies.
 9                   Who wants to take the lead for Mr. Willey?
10             MR. GERSTEIN:  That will be me, Your Honor.
11   This is Mr. Gerstein.
12             THE COURT:  All right.  Mr. Gerstein, why is
13   the suit brought in his name rather than the name of his
14   charity?
15             MR. GERSTEIN:  I'm sorry.  Your Honor, I did
16   not hear that.
17             THE COURT:  Why is the suit brought in Willey's
18   name rather than the name of the charity that he purports
19   to run?
20             MR. GERSTEIN:  Thank you, Your Honor.
21                   Mr. Willey at the time that he did the
22   acts complained of in the complaint was doing so in his
23   private capacity.  He is an employee of the nonprofit
24   organization, but he also maintains a private practice, so
25   this suit seeks to vindicate his individual rights.
```

03:53:08 (line 5)
03:53:23 (line 10)
03:53:36 (line 15)
03:53:51 (line 20)
03:54:03 (line 25)

1          THE COURT:  All right.  So the charity has

2 nothing to do with this case, then?  We're talking about --

3          MR. GERSTEIN:  That is correct.

4          THE COURT:  -- his opportunity.  Would it

03:54:15  5 surprise you to learn that the charity has lost its

6 standing with the IRS?

7          MR. GERSTEIN:  My understanding, Your Honor, is

8 that the charity is currently engaged in similar conduct,

9 if that was the question.  I did have a little trouble

03:54:30 10 hearing you.  I'm sorry.

11          THE COURT:  All right.  According to the

12 charity's own website, it says they lost in, I think it's

13 2018, and they are in negotiations with the IRS to resume.

14 Perhaps that's why Mr. Willey is bringing it in his own

03:54:55 15 name.

16          MR. GERSTEIN:  I can represent to the Court

17 that since the filing of this suit, Mr. Willey has become

18 chief executive officer of the nonprofit organization, and

19 it has experienced a significant increase in fundraising

03:55:10 20 over the last four or five months.  But at the time he

21 brought this suit, he was practicing as a private criminal

22 defense attorney, and that was the purpose of bringing it

23 in his own name.

24          THE COURT:  What -- so we can eliminate

03:55:35 25 everything in the complaint that alludes to charity and the

1  downtrodden, and just he's a lawyer who is sending letters

2  about the quality of representation by existing counsel.

3  Those are the facts now?

4             THE CASE MANAGER:  Are you going to use the

03:56:04   5  cell phone?

6             THE COURT:  She couldn't make it work.  So --

7             THE CASE MANAGER:  Okay.

8             THE COURT:  We are still trying to improve the

9  phone situation.

03:56:13  10             MR. GERSTEIN:  That sounds much better, Your

11  Honor.  If you would like, I can clarify.

12                  I mean, in his private capacity he was

13  working entirely on a volunteer basis for the downtrodden.

14  So I don't think we would want to eliminate those

03:56:27  15  components of the complaint, but the suit is brought in his

16  own individual name.

17                  To update the Court on subsequent

18  developments, though, and to be completely candid, just so

19  there is no misunderstanding, the nonprofit organization

03:56:39  20  engages or at least prior to the this lawsuit engaged in

21  similar conduct and would, if Mr. Willey prevails in this

22  suit, intend to engage in similar conduct in the future,

23  but --

24                  (Phone call placed over Court's system.)

03:57:03  25             MR. GERSTEIN:  Hello, this is Charles Gerstein.

1          THE COURT:  All right.  Can you hear me now?

2          MR. GERSTEIN:  Yes, I can.  Thank you.

3          THE COURT:  All right.  You're coming over the

4 main section.  Now we have got to get Mr. Fennell.

03:57:19  5          MR. GERSTEIN:  Thank you.

6          THE COURT:  All right.  You still there?

7          MR. GERSTEIN:  I am.  Thank you, Your Honor.

8          THE COURT:  Okay.  Now we're going to work

9 on --

03:57:27  10         THE CASE MANAGER:  I can't join more than one

11 person.

12         THE COURT:  Oh, Mr. Fennell --

13         MR. FENNELL:  Yes, Your Honor.

14         THE COURT:  -- the computer doesn't want you,

03:57:41  15 so, I'm sorry, you will have to stay on the phone, but

16 Mr. Gerstein is now on the speaker phone.

17              All right.  Mr. Gerstein, you were going

18 to explain some more.

19                  Mr. Gerstein?

03:58:01  20         MR. GERSTEIN:  Yes, Your Honor.

21         THE COURT:  You were explaining something.

22         MR. GERSTEIN:  Sure.  So to clarify it for the

23 Court, and I hope I am not repeating something already in

24 the record, since the filing of this lawsuit Mr. Willey has

03:58:15  25 accepted a position as full-time CEO for the charity.  And

1  in full candor to the Court, so there is no

2  misunderstanding, although the suit is filed in his

3  individual capacity, Mr. Willey's charity would intend to

4  engage in similar conduct if he prevails in this suit.  So,

03:58:33  5  although the charity is not a party, it is not that it has

6  no interest in this litigation either.

7       THE COURT:  All right.  But it can't have its

8  interests represented here.

9       MR. GERSTEIN:  That's correct, Your Honor.

03:58:54  10  Currently it does not.  I'm not sure if it made it into

11  the record and clarify the question the Court asked, when

12  Mr. Willey was practicing in his private capacity, he was

13  doing so in a fully volunteer basis on the behalf of those

14  who could not afford an attorney.  So to the extent Your

03:59:11  15  Honor is interested in the distinction between his

16  charitable private practice, I think for purposes of the

17  First Amendment case, they are securely similarly situated.

18       THE COURT:  Well, theoretically, there would be

19  a lot of people who might like to do what Mr. Willey is

03:59:31  20  doing but aren't because of the statute.

21       MR. GERSTEIN:  That is correct, Your Honor.

22       THE COURT:  So you understand the charity says,

23  the IRS automatically revokes tax exempt status for any

24  nonprofit organizations missing three consecutive years of

04:00:02  25  tax filings.

1              So the problem apparently was not they

2 didn't have any charity.  It was they didn't have any

3 reports.  You know how understanding the IRS is.

4              MR. GERSTEIN:  Yes, Your Honor.  I am not aware

04:00:20  5 of any issues with the tax filing for the charity.  I can

6 look into that and submit further briefing, but this is the

7 first I have heard of it, Your Honor.

8              THE COURT:  So, apparently there are several --

9 there's Restore Justice Foundation, Pressure Blood Ministry

04:01:11  10 of Reconciliation, Restore Justice Illinois.  None of those

11 is here, right?  We just -- we just have Mr. Willey?

12              MR. GERSTEIN:  That is correct.  The only

13 parties before the Court are Mr. Willey and District

14 Attorney Ogg, Your Honor.

04:01:34  15              THE COURT:  How does Mr. Willey report --

16 support himself?

17              MR. GERSTEIN:  At the time of the filing of

18 this lawsuit, he maintained private practice of criminal

19 defense law in Houston and Galveston.  Since then, about

04:01:48  20 six weeks ago he became full-time CEO of Restoring Justice,

21 and I believe that he is going to focus primarily on that

22 going forward.

23              THE COURT:  Well, I don't understand why I

24 should enjoin a judge or the District Attorney in the

04:02:48  25 absence of blood on the floor.  I don't have the complete

1  history memorized, but if there is a need to stop the

2  practice, that can be addressed in short order; but another

3  month or two or three of delay with that statute having

4  been in force for some time doesn't seem to me to be

04:03:38  5  irreparable harm.  And he is not representing the poor and

6  downtrodden.  He wants to represent them by sending

7  communications to them about their existing lawyer; is that

8  correct, Mr. Gerstein?

9          MR. GERSTEIN:  That is correct, Your Honor.

04:04:03  10  And in terms of -- if this is an appropriate time to

11  respond, please let me know.

12          THE COURT:  No.  That's why we gather.

13          MR. GERSTEIN:  Thank you, Your Honor.

14          So, under *Elrod v. Burns*, a delay in -- in

04:04:17  15  the attempt to vindicate his First Amendment right is

16  treated as irreparable, the same with *Oppulant Life Church*.

17  And just as a factual matter, I'll tell the Court, he is

18  eagerly trying to set up his law practice now in a way that

19  complies with the law but also vindicates his

04:04:34  20  constitutional rights, and so he did not file a motion for

21  preliminary injunction just as a matter of course.

22          He does seek relief from the Court as

23  quickly as possible, not withstanding that the statute has

24  been in force for a while, and that's because he is -- his

04:04:48  25  project is of recent vintage, and cannot continue without a

1  definitive statement is correct.

2         THE COURT:  Well, I have actually read the

3  Constitution.  While it is not true that I threw a copy of

4  it at a prosecutor, I did throw it to him.  His poor

04:05:19  5  catching may have made it a "to."

6               There are different kinds of irreparable

7  harm, and this needs a thoughtful approach.  The -- many of

8  the State Bar's practices that clearly trenched on the

9  First Amendment have been prudent over the years.  In my

04:06:02  10  case, many, many years.

11               But there is a difference from a

12  competitive disruption of trying the state, really, but in

13  this case the county's effort to find representation for

14  the indigent is not intrinsically repressive.  And, of

04:06:43  15  course, barratry has applied to people making ten figures

16  income.  It's not a question of whether Mr. Willey wants to

17  do it for charity or not.  Having been in private practice

18  myself, I did a whole lot of pro bono work that I had not

19  intended to be pro bono.

04:07:10  20               And so we need to have some time, briefly,

21  to make sure we understand the facts, and that is, in part,

22  the practice under the barratry statute.

23               Mr. Durfee, do you want to give us an idea

24  of what the actual practice is, like how many -- how many

04:08:02  25  barratry cases does Harris County have on its docket?

1        MR. DURFEE:  Your Honor, at the present time I

2    don't have that statistic.  I can tell you from having been

3    a prosecutor for almost 32 years, that barratry is rare,

4    but it is -- the barratry prosecutions are rare, but they

04:08:22    5    are enforced.  We have had barratry prosecutions in various

6    contexts.  And we have raised this specific issue with the

7    District Attorney as to whether she wants to waive her

8    prosecutorial discretion to prosecute these matters, and

9    she wants to reserve that right as is accorded to her under

04:08:45    10    the Texas Constitution and state law.

11        THE COURT:  Give me an idea of one you

12    prosecuted in the past, if you have the situation involved

13    to mind.  If you don't, I understand.

14        MR. DURFEE:  I don't have -- I don't have a --

04:09:01    15    I cannot in recent history recall a nonprofit entity

16    engaged in this particular fact pattern, and that was what

17    made this case unique was that we don't contest the idea

18    that a nonprofit can go out and solicit clients to pursue a

19    mode of expression like the *Button* case did.

04:09:24    20        Our concern, obviously, is on the much

21    narrower issue of can a nonprofit go to somebody who is

22    currently represented by counsel, and make a run at that

23    client without doing the courtesy of informing that

24    client's lawyer that they are doing it?

04:09:43    25        And that seems to be Mr. Willey's practice

1  in this situation.

2        THE COURT:  Well, there's indirect competition

3  for existing clients all the time, as you drive down the

4  freeway, and say, "Hurt?  Guaranteed results."  I think

04:10:01  5  they just guarantee you get a result, not any particular

6  result.

7             So, you can't remember a charity.  So

8  we're dealing with routine competition.

9        MR. DURFEE:  No, Your Honor.

04:10:24  10       THE COURT:  Mr. Gerstein, has any state

11  abolished barratry that you know of?

12       MR. GERSTEIN:  I do not know, but I will

13  represent to the Court that there are only three states

14  that prohibit the solicitation of represented parties for

04:10:50  15  nonpecuniary gain.  They are Alabama, Arkansas, and Rhode

16  Island.  And Texas is the only state that criminalizes

17  soliciting represented parties for nonpecuniary gain.

18       THE COURT:  What's the difference between doing

19  it for nothing, and doing it for half price of what the --

04:11:17  20       MR. GERSTEIN:  So, according to the Supreme

21  Court's decision in *Ohralik* and *Primus*, the distinction is

22  between engaging in commercial speech and engaging in core

23  political speech.  At the same time the state's interest in

24  regulating the practice of barratry for money is far

04:11:35  25  greater than the state's interest in regulating the

1  practice of barratry for ideological purposes because, you

2  know, as I am in nonprofit practice myself, and so when I

3  speak to clients, it's only for the purpose of fulfilling

4  our mission.  But I can see how it would be much more

04:11:50  5  difficult to set aside the client's concerns and various

6  rules of decorum and practice when, you know, one's own

7  salary depends on it.  I think that's the notion underlying

8  the Supreme Court's distinction, Your Honor.

9              THE COURT:  The Supreme Court has made several

04:12:12  10  phenomenally erroneous decisions about commercial speech.

11  There is nothing in my Constitution that says no law except

12  ones involving business.  And so it should be broader --

13  broadly construed.  By the time you list all of the

14  exceptions that have been allowed, it gets to be a crippled

04:12:40  15  principle, but it's not -- it's not for Mr. Willey, or his

16  charity, or -- to decide that not doing it for money makes

17  them special because, obviously, they are -- they're

18  billing the caring public by advertising and collecting

19  gifts.

04:13:28  20              Somebody has to pay for the office, and

21  the stationery that says "CEO" on it, and all that sort of

22  thing.  And so to draw a distinction between somebody who

23  is ideologically stirring up trouble between clients and

24  their counsel, and commercially doing it, seems like a

04:13:54  25  false distinction.

1          MR. GERSTEIN:  Your Honor, two responses to

2 that.  The first is to the extent that Your Honor's view is

3 that this would be unconstitutional as applied to people

4 engaging in commercial speech -- (audio interrupted due to

04:14:13   5 technical problems, speech indiscernible.)

6          THE COURT REPORTER:  I can't understand him,

7 Judge.

8          MR. GERSTEIN:  And under *Shapero v. Kentucky*

9 *Bar Association,* I think it is true that the statute would

04:14:24  10 be unconstitutional as applied to someone doing exactly

11 what Mr. Willey did for money but in writing.  At the same

12 time, though, the distinction is a matter of existing

13 Supreme Court law is what it is, and from my perspective,

14 and Mr. Willey, particularly, wants to fall on the correct

04:14:46  15 side of existing law.

16          THE COURT:  Mr. Fennell, do you have anything

17 you would like to add?

18          MR. FENNELL:  No, Your Honor.  I will -- I

19 defer to Mr. Gerstein's argument.  Thank you.

04:15:04  20          THE COURT:  Are you all at the same place?

21          MR. GERSTEIN:  We are not, Your Honor.  I am

22 in --

23          THE COURT:  You're in the high rent district.

24          MR. GERSTEIN:  Yes, Your Honor.

04:15:16  25          THE COURT:  Although Austin is trying.

1              MR. FENNELL:  They sure are.  They sure think

2 they're in competition.

3              THE COURT:  Ms. Stevens, you want to add

4 anything?

04:15:33   5              MS. STEVENS:  No, Your Honor.

6              THE COURT:  All right.  The first thing I need

7 from Mr. Willey is more precise factual data about what he

8 is doing, how he's doing it, and then I need to know some

9 cases he's done in this system.

04:16:08   10             Why doesn't Mr. Willey go over -- I'm not

11 sure how it works in the state system -- and ask one of the

12 state judges to appoint him at no cost?

13             MR. GERSTEIN:  Your Honor, Mr. Willey is, in

14 fact, eligible for appointments on the appointed counsel

04:16:30   15 list.  And the issue is that people who are already

16 represented by attorneys carrying caseloads many multiples

17 in excess of what state standards recommend, the people

18 whom those people represent don't know that they have a

19 right to anything other than what they they're receiving.

04:16:49   20 So I think from Mr. Willey's perspective, it wouldn't solve

21 the problem he is seeking to address.

22             But just perhaps at one higher level, it

23 is not Mr. Willey's burden to show that his political

24 speech is the best or the most efficient way of addressing

04:17:04   25 a social problem, but rather the state's burden to show

1  that its restriction on his speech is narrowly tailored to

2  foreign and compelling interests.  So from his perspective,

3  he has chosen this course of action and he has the right to

4  engage in it, and would like to avoid being prosecuted for

04:17:23   5  doing so.

6          THE COURT:  Well, at the moment, this seems

7  like the antisodomy law, and I believe it was in Georgia,

8  where a deputy sheriff was serving papers on somebody in

9  the apartment, and happened to see some people doing things

04:17:54  10  that apparently looked like they were violating the law,

11  and he said nothing then or later.  But the people who were

12  observed filed a peremptory action, and contrary to my

13  expectations, the Supreme Court took it after the district

14  judge in Atlanta and the circuit court both said there is

04:18:23  15  no case or controversy here.  The DA filed an affidavit

16  that he had been DA 20 years, and never prosecuted a single

17  case under the statute, and didn't intend to start now.

18          Mr. Willey has not been threatened with

19  prosecution, other than it is the policy of the Harris

04:18:48  20  County District Attorney to follow the law, and she has

21  enough business from the six million people or so to not

22  give her any motive to go look for business.

23          MR. GERSTEIN:  Your Honor, it --

24          THE COURT:  Yes, sir.

04:19:13  25          MR. GERSTEIN:  Oh, I'm sorry.  Is it --

1  (Audio interruption.)

2          THE COURT:  It's going crazy, but it's not your

3  fault.

4          MR. GERSTEIN:  Glad to hear that.  So, if -- if

04:19:25  5  the District Attorney represents that she does not intend

6  to prosecute conduct as described in the complaint, in the

7  motion for preliminary injunction, this case would be moot,

8  and we would be two happy people because Mr. Willey would

9  not fear prosecution.

04:19:38  10          Unfortunately, unlike the Georgia case

11  Your Honor was discussing, the District Attorney, as

12  Mr. Durfee helpfully pointed out, explicitly has not

13  disclaimed an intention to do that.  If she would like to

14  represent that she did not intend to prosecute Mr. Willey,

04:19:55  15  then, I agree that there is no threat of irreparable harm.

16          THE COURT:  Well, the problem with that is I

17  don't think it's binding on the District Attorney, and I

18  don't know that you know, but the district attorneys have

19  districts by county, but the district attorney is, in fact,

04:20:25  20  a state official, not a county official.

21          Apparently, a number of Texas founding

22  fathers had unfortunate experiences with prosecutors

23  somewhere in their past, and decided to keep them under

24  close watch.  They also didn't give our Attorney

04:20:50  25  General any prosecutorial authority.  They have changed it

1  for child support and something else.

2  Well, get him to do a very precise, brief,

3  nonlegalistic statement of what he's done, how many cases

4  he has gotten, how many letters he sent, copies of the

04:21:23  5  letter, or two.  I am not doing it off of charity's press

6  release.  I want to know the facts of what he has done, and

7  did somebody threaten him with prosecution?

8  MR. GERSTEIN:  Your Honor, so two things to

9  address.

04:21:43  10  First, in the complaint, we detail exactly

11  how many people he has contacted on how many occasions.  I

12  am pulling up the paragraph numbers.  But he has

13  communicated with 22 people represented by Mr. Jerome

14  Godinich.  That is Paragraph Number 30 in the complaint.

04:22:00  15  So I think Your Honor's question is addressed by the

16  complaint.  We didn't submit anything from the charity or

17  press release from the charity.

18  So I don't know if that addresses the

19  concern, but...

04:22:24  20  I would also ask, Your Honor, if you would

21  like further briefing, to help me understand what the

22  relevance of more specific description of conduct would be.

23  As our understanding of the law is, he has the First

24  Amendment right, or he doesn't, but from our argument he

04:22:39  25  has the First Amendment right to speak to people under

1 these circumstances, and there appears to be no dispute

2 about what those circumstances are.  So I think he has

3 already satisfied the Court's concern for a specific record

4 on that question.

04:23:07   5          THE COURT:  I am a little troubled by

6 Mr. Willey, being a lone wolf now, is also CEO of a defunct

7 charity.  Not sure it matters except if he is CEO, and he's

8 -- I'll just -- shall I just assume that any cases he gets

9 while he's acting alone will be handled through the

04:23:41   10 charity?

11          MR. GERSTEIN:  I don't -- I can't be certain of

12 that, Your Honor, but I don't know why there would be a

13 distinction.  To my knowledge, the charity is not defunct.

14 I'm not sure why Your Honor thinks it is, but I can address

04:23:57   15 that in further briefing.

16          I am --

17          THE COURT:  Counsel -- counsel, just go on

18 their website and there is a long explanation about their

19 tax problems.  They lost their standing with the IRS, which

04:24:12   20 is not important, perhaps, to the people doing the work,

21 but it is to the people funding it.

22          MR. GERSTEIN:  Your Honor, if that's

23 Restoringjustice.org, I don't see any such notice.  There

24 might be another charity named "Restoring Justice," but to

04:24:32   25 my knowledge the charity where Mr. Willey is CEO is a

1   Houston based nonprofit serving indigent people with

2   holistic criminal defense, and it remains in good standing

3   with the IRS.  I am looking at the website right now.

4           THE COURT:  What's the name of it?

04:24:50   5           MR. GERSTEIN:  Restoring, R-E-S-T-O-R-I-N-G,

6   Justice, J-U-S-T-I-C-E dot O-R-G, the website.

7           And it appears to be fully tax deductible.

8   But just to make clear for the record, so the court

9   reporter gets this, we didn't submit any of this in the

04:25:10   10   record, and do not believe it is relevant to the case, but

11   I'll read from the website now.

12           It reads, "Restoring Justice is a

13   501(c)(3) nonprofit organization.  All donations are tax

14   deductible to the extent allowed by the law."

04:25:43   15           THE COURT:  Well, there is a

16   Restorejustice.org.

17           MR. GERSTEIN:  Oh, that might be the issue,

18   Your Honor.  I think that is a different organization.

19           THE COURT:  Well, the statement that they are

04:26:01   20   fully deductible to the extent of the law doesn't answer

21   the question of are they deductible under the extent of the

22   law which includes an IRS requirement that you file these

23   annual reports?

24           So that's one of those universal phrases.

04:26:27   25           MR. GERSTEIN:  Uh-huh.  I'll represent to the

 1  Court now I have no reason to think there is any issue with

 2  Restoring Justice's tax filing status, and I don't think it

 3  would be relevant to the issues before the Court if there

 4  was.

04:26:50   5          THE COURT:  Well, the things charities do are

 6  not entirely different from what people do, that for-profit

 7  people do.  They may be funded slightly differently.  And

 8  churches raise their money by donations, too.

 9          MR. GERSTEIN:  That is right, Your Honor, but,

04:27:35  10  again, Restoring Justice is not a party before the Court.

11  I am looking right now at its 2018 990 report, Form 990 to

12  the IRS.  To my knowledge it appears to be in compliance,

13  just to make sure that is clear for the record.  But I

14  don't -- I can't see what the relevance of that would be.

04:27:51  15          Mr. Willey is before the Court in his

16  individual capacity.  He has inferred that he intends to

17  engage in conduct prohibited by the statute but protected

18  by the First Amendment in the future under existing Supreme

19  Court law that is quite clear gives Article III

04:28:07  20  jurisdiction to this Court, as defendant concedes.

21          I am -- I can speak to Mr. Willey about

22  whether to supplement to the record, but I can't represent

23  to the Court right now that Mr. Willey would be willing to

24  do that.

04:28:36  25          THE COURT:  Mr. Durfee, anything?

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1        MR. DURFEE:  No, Your Honor.  Thank you.

2        THE COURT:  All right.  Well, I am going to

3 take this up.  I may have some questions.  And, Mr.

4 Fennell, we will try to get the phones fixed.  We have been

04:29:00  5 working on them for three months.

6        MR. FENNELL:  Yes, Your Honor.

7        THE COURT:  Ms. Stevens?

8        MS. STEVENS:  Nothing, Your Honor.  Thank you.

9        THE COURT:  All right.  Thank you, Counsel.

04:29:17 10        MR. GERSTEIN:  Thank you, Your Honor.

11        THE COURT:  You may be excused, too.

12        MR. DURFEE:  Thank you, Judge.

13 (Concluded at 4:29 p.m.)

14            COURT REPORTER'S CERTIFICATE

15

16    I, Kathleen K. Miller, certify that the foregoing is a

17 correct transcript from the record of proceedings in the

18 above-entitled matter.

19

20 DATE: Aug. 5, 2020        /s/    _Kathleen K. Miller

21                          Kathleen K. Miller, RPR, RMR, CRR

22

23

24

25